**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**In re:**

| | |
|---|---|
| PAUL E. OLSEN and CHERYL R. OLSEN, individually, | Case No. 10-39799-svk |
| Debtors. | Chapter 11 |

---

### MOTION FOR APPOINTMENT OF A CHAPTER 11 TRUSTEE

---

NOW COMES BNP Paribas ("BNPP"), as Administrative Agent ("Agent") for certain Lenders (hereinafter defined) and a party-in-interest in the above-captioned Chapter 11 bankruptcy case (the "Bankruptcy Case") filed by Paul E. Olsen and Cheryl R. Olsen, Individually (together, "Olsens" or the "Debtors"), and files this *Motion for Appointment of a Chapter 11 Trustee* (the "Motion"), and in support hereof, respectfully states as follows:

### I. PRELIMINARY STATEMENT

1. The Lenders are judgment creditors of the Olsens in the amount of not less than $50,703,904.17, in connection with Paul Olsen's guaranty of the obligations of Olsen's Mill Inc. ("OMI") to the Lenders. Paul Olsen, along with his brother David Olsen, are principals and former owners of OMI who directed OMI into insolvency, resulting in one of the largest grain elevator liquidations in Wisconsin.

---

Drafted by:

| | |
|---|---|
| Timothy F. Nixon | Joseph J. Wielebinski |
| Carla O. Andres | Deborah M. Perry |
| GODFREY & KAHN, S.C. | MUNSCH HARDT KOPF & HARR, P.C. |
| 333 Main Street, Suite 600 | 3800 Lincoln Plaza |
| Green Bay, Wisconsin 54301 | 500 North Akard Street |
| Telephone: (920) 432-9300 | Dallas, Texas 75201-6659 |
| Facsimile: (920) 436-7988 | Telephone: (214) 855-7500 |
| Email: tnixon@gklaw.com | Facsimile: (214) 855-7584 |
| candres@gklaw.com | Email: jwielebinski@munsch.com |
| | dperry@munsch.com |

2. Paul Olsen has an admitted record of fraud, dishonesty and illegal conduct in his management of OMI. After the United States Department of Agriculture charged OMI with knowingly issuing false certificates to the USDA, OMI, with Olsen's approval, pled guilty to the charge in September 2007. In its plea agreement, OMI acknowledged that Olsen knowingly provided false corn samples to the USDA so that the value of OMI's shipment – based on the quality and grade of corn – would be inflated by hundreds of thousands of dollars.

3. Paul Olsen has also engaged in fraudulent activities in his business relationships with the Lenders. He admittedly, fraudulently induced the Lenders to extend credit to OMI by providing knowingly false financial borrowing base certificates as OMI's financial condition deteriorated under his mismanagement. During this same period, Olsen implemented a plan to dissipate and divert the Lenders' collateral to and for the benefit of his related entities.

4. Moreover, Paul Olsen has demonstrated himself to be subversive of the judicial process. His attempts to divert assets in order to frustrate the Lenders' rights led to the commencement of a receivership proceeding over OMI's assets to protect the value thereof, and to address Olsen's mismanagement and diversion of OMI's assets. Olsen has repeatedly violated and ignored Receivership orders intended to maximize the value of OMI's assets, for his own personal benefit, and has shown little respect for judicial authority and process, or for the duties imposed upon him by virtue of court supervised insolvency proceedings. As a result, in light of this demonstrated pattern of dishonesty, bad faith, fraudulent conduct, and contempt for judicial authority, BNPP respectfully requests that this Court issue its Order appointing a Chapter 11 Trustee.

## II. JURISDICTION AND VENUE

5. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157. This Motion constitutes a core proceeding pursuant to 28 U.S.C. §§ 1408 and 1409.

6. Venue of the Bankruptcy Case and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. PROCEDURAL BACKGROUND

7. On December 16, 2010 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), thereby initiating this Bankruptcy Case.

8. The Debtors remain in possession of their assets and continue to operate their affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## IV. FACTUAL BACKGROUND

**A. The Credit Agreement With BNPP**

9. OMI was a major operator of various grain elevators in Wisconsin which provided feed, seed, fertilizer, and crop protection products as well as the marketing, drying and storage thereof. Paul and David Olsen are principals and owners of OMI.

10. On or about August 8, 2007, OMI executed a Credit Agreement, establishing a revolving credit facility to finance OMI's working capital requirements. The Credit Agreement was executed by and among OMI, the lender parties thereto (the "Lenders")[1], and BNPP as Administrative Agent.[2] Pursuant to the Credit Agreement, the Lenders extended credit to OMI as evidenced by three (3) separate Revolving Credit Notes Swing Line (Credit) Note (collectively, the "Notes").

11. As security for its obligations under the Notes, the Credit Agreement and the Loan Documents, OMI entered into a Security Agreement, dated August 8, 2007 (the "Security

---

[1] The Lenders consist of BNPP, Baylake Bank, and RZB Finance LLC.

[2] In connection therewith, OMI and the Lenders executed certain related documents and instruments (collectively with the Credit Agreement, the "Loan Documents") including, without limitation, the Notes, Security Agreement and Account Control Agreements (as those terms are defined in the Loan Documents and further discussed hereinbelow).

Agreement") which granted BNPP as Agent, among other things, security interest in all of OMI's rights, title and interests in substantial of OMI's owned and after-acquired property (collectively, the "Collateral").[3] BNPP, as Agent, duly perfected its first priority security interests in the Collateral. Accordingly, all Obligations (as defined in the Credit Agreement) of OMI to BNPP as Agent pursuant to the Loan Documents were secured by valid, perfected and binding security interests or liens in the Collateral.

**B.     The Guaranty**

12.    In order to induce the Lenders to extend the foregoing credit facilities to OMI, Paul Olsen and David Olsen, as well as OMI affiliates Olsen Brothers Enterprises, LLP ("OBE") and Olsen's Leasing LLC (collectively, the "Guarantors") each executed a guaranty (the "Guaranty") guaranteeing to the Lenders all of OMI's Obligations arising under the Credit Agreement and the Loan Documents.

**C.     Olsen's Fraudulent Conduct Prior to The Wisconsin Receivership Proceeding**

**1.     Olsen Attempts to Defraud the Federal Government and OMI's Customer**

13.    On September 18, 2007, the USDA issued its Information ("Information") charging OMI with knowingly causing the issuance of false certificates by representing that fifty (50) grain samples provided to the USDA for grading were official samples, when OMI "well knew" that they were not. That same month, OMI, pursuant to a resolution executed by its Board of Directors, including Paul Olsen, entered into a plea agreement with the USDA ("Plea Agreement") admitting guilt. True and correct copies of the Information and Plea Agreement are attached hereto as **Exhibit "A"** and incorporated herein by reference for all purposes.

---

[3] BNPP's Collateral includes, without limitation, all of OMI's: (i) accounts; (ii) bank accounts; (iii) chattel paper; (iv) documents; (v) general intangibles; (vi) instruments, including all commodity accounts and commodity contracts; (vii) inventory; (viii) investment property; (ix) supporting obligations; (x) payment intangibles; (xi) letter of credit rights; (xii) commercial tort claims; (xiii) related books, records, computer software, hardware and access codes; (xiv) machinery and equipment; and (xv) all proceeds and products of any and all of the foregoing.

14. Specifically, the Plea Agreement acknowledges that Paul Olsen, acting as OMI's Secretary and Treasurer <u>knowingly</u> provided fifty (50) <u>false</u> samples purportedly taken from each of fifty (50) carloads of corn being shipped from OMI to Corn Products International, Inc. ("<u>CPI</u>"), rather than providing actual samples. This conduct caused the WSDA to certify the corn in these carloads as high grade No. 1 or 2, when, in fact, it was of a lower quality and value.[4] As set forth in the Plea Agreement, the USDA determined that this scheme would have defrauded CPI in the amount of approximately $261,846.00.

### 2. Olsen Shifts His Efforts to Diverting OMI's Assets to Insiders and Affiliates

15. By the Fall of 2008, BNPP and the Lenders had discovered overwhelming evidence establishing that Paul Olsen had repeatedly breached his fiduciary duties owed to OMI and its creditors, including the Lenders, by engaging in a scheme to drain OMI of its assets. Critically, Olsen intentionally submitted to the Lenders written Borrowing Base Certificates ("<u>Certificates</u>") that contained knowing misrepresentations, in order to defraud and induce the Lenders into making further advances under the Credit Agreement. Olsen knew that the Lenders relied upon these certificates to calculate the amount of advances to provide to OMI and to monitor the status of their Collateral.

16. As with the USDA, Paul Olsen has admitted to such fraudulent actions. On September 20, 2008, Olsen wrote to Dave Miller, Chief Credit Officer at Baylake Bank, informing him that "[BNPP wanted] me to sign the [Borrowing Base] certificate, which when I read it, I **then commit myself to fraud as I know the base is not in compliance** [sic]. What do you think I should do?" (emphasis added). After Dave Miller's response that he has no thoughts on the issue, Paul Olsen proceeded to certify the September 15th and 30th, 2008 Certificates,

---

[4] OMI's scheme was discovered when the carloads arrived at CPI's facilities. Fortuitously, after approximately 17 of the car loads had been unloaded, a CPI employee questioned the quality of the corn, and CPI arranged for a third party inspector to re-grade the corn.

despite his knowledge that they were materially inaccurate, and his admission that his execution thereof constituted fraud upon the Lenders. A copy of the email exchange by Paul Olsen is attached hereto as **Exhibit "B"** and incorporated herein by reference for all purposes. Olsen's additional fraudulent Certificates for OMI include:

(a) An April 30, 2008 Certificate in which Olsen included $4.3 million in cash comprised of checks issued by Renew Energy, an entity partially owned by Paul Olsen and David Olsen, and an insider of OMI and the Olsens. In reality, these "checks" had not been deposited by OMI because Olsen knew that Renew Energy had insufficient cash to cover them;

(b) An August 31, 2008 Certificate in which Olsen included 856,238 bushels of grain (valued at $4.8 million) as current inventory, despite that such inventory had previously been shipped to Renew Energy;

(c) A November 30, 2008 Certificate in which Olsen failed to include $379,186.00 worth of Feed Grain inventory, in excess of the Borrowing Base cap;

(e) In multiple Borrowing Base Certificates, Olsen included Renew Energy accounts receivable in the Borrowing Base, with knowledge that Renew Energy did not have the financial resources to meet its obligations, thereby inflating the Borrowing Base availability. Excluding the current Renew Energy receivables from the Borrowing Base accounts receivable reduced the Borrowing Base accounts receivable by approximately $6 million.

17. These intentional, fraudulent actions by Olsen artificially inflated OMI's Collateral values and concealed significant Collateral shortfalls which would have revealed OMI's true financial condition. In fact, Paul Olsen, as then-president of OMI, repeatedly stated his intentions to reduce OMI's Borrowing Base availability in order to negatively impact the Lenders' Collateral and their recovery.

18. Paul Olsen further implemented his intentional scheme to defraud OMI's creditors for his own benefit by arranging a series of below-market transactions for OMI with affiliates, including the diversion of millions of dollars to Renew Energy. On or prior to September 15, 2008, Renew Energy had confirmed to OMI that it would be unable to pay a $21 million

receivable absent an infusion of third party equity into Renew Energy. OMI then disclosed to BNPP that its "Related Party Receivables" had increased from $15 million to $25 million as a result, were not performing – but were being carried on OMI's balance sheets in a manner so as to conceal their non-performance – and that OMI was experiencing significant liquidity problems as a result.

19. Despite knowing Renew Energy's financial condition and the lack of intention or ability to meet its obligations, OMI knowingly diverted OMI's assets by shipping corn to Renew Energy. Between December 2007 and December 2008, OMI repeatedly sold corn to Renew Energy at below market prices, recorded these "sales" as assets with values OMI knew would never be collected, thereby shifting an estimated net benefit to Renew Energy of approximately $9.5 million. By January 28, 2009, Renew Energy owed at least $18 million in past due accounts receivable to OMI. Paul Olsen made these relevant decisions for OMI.

**D.     BNPP Commences the Receivership Proceeding and Olsen's Interference Therewith**

20. As a result of these discoveries by the Lenders, on January 28, 2009, BNPP, as Agent, filed a Complaint (the "Complaint") against OMI in the Circuit Court for Green Lake County, Wisconsin, Case No. 2009-CV-25, together with a motion to appoint a receiver to protect and administer OMI's assets in accordance with § 128.08(1)(b) of the Wisconsin Statutes. On February 11, 2009, Michael S. Polsky was appointed interim receiver of OMI (the "Receiver"), by order of the Wisconsin Circuit Court (the "Receiver Order").

21. Following his appointment, the Receiver focused primarily on maintaining OMI's operations and preserving its assets. This daunting task was substantially complicated by a series of actions undertaken by Paul Olsen (or entities owned or controlled by Olsen) to impair, impede, prohibit or prevent the Receiver from fulfilling his duties pursuant to the Receiver Order and in violation thereof.

Page 7

Case 10-39799-svk    Doc 25    Filed 01/18/11    Page 7 of 16

22. Olsen, his relatives, and other insiders and affiliates engaged in a systematic plan to thwart the efforts of the Receiver and to attempt to position OMI's owners to regain control of the company for their own benefit.

23. On February 27, 2009, Walt Ledger, on behalf of the Receiver, spoke with David Olsen regarding a scheduled visit by a prospective purchaser to Steven's Point, one of the OMI grain elevators. The Steven's Point elevator is one of several leased to OMI by OBE, a partnership of Paul and David Olsen. David Olsen told Mr. Ledger that potential buyers of OMI were not allowed to visit its leased facilities with OBE and that OMI's operations would be shut down by the following Wednesday. When Mr. Ledger attempted to obtain additional information regarding such potential shutdown, David Olsen refused to reveal any names to him and only stated that "reliable sources" had told him that OMI would be imminently shut down. The efforts were clearly intended to "chill" any prospective interest of potential bidders in OMI's assets.

24. On February 26, 2009, the Receiver received a letter purportedly sent on behalf of OBE and the Olsens relating to the Lease Agreements between OBE and OMI. The letter stated that on February 27, 2009, OBE, as landlord, was declaring a default on certain of these grain storage facility leases based on the institution and continuance of the Receivership, which Paul Olsen had consented to, for a period of thirty (30) days. The letter stated that OBE was not terminating the leases, but was terminating the Receiver's right to possession of the leased property, and asserted that the Receiver could not show the property for sale, assignment or sublease. As a result, the Receiver was forced to file an Emergency Motion to halt these actions taken in violation of the Receiver Order.

Page 8
Case 10-39799-svk    Doc 25    Filed 01/18/11    Page 8 of 16

25. Moreover, OMI was party to a sale contract with Utica Energy, LLC ("Utica"), partially owned by Paul Olsen, for OMI to supply all of Utica's needs for corn. On February 19, 2009, the Receiver received a letter from Utica asserting insecurity as to OMI's future performance, by virtue of the Receivership. Despite the fact that Utica at the time owed over $2.1 million to OMI, under Paul Olsen's authority Utica then demanded adequate assurance of performance by OMI, attempted to unilaterally alter the terms of Utica's payment obligations to OMI, and refused to perform otherwise.

26. By his participation in the foregoing actions, Paul Olsen intentionally damaged OMI's creditors in an effort retain control of OMI. Committed on the heels of the Receiver's appointment, these were blatant attempts to hinder, delay, impair, impede and prevent the Receiver from carrying out his duties and responsibilities during a critical phase of the Receivership. They substantially increased the costs of the Receivership, and demonstrated Olsen's lack of respect for the judicial process, his fiduciary duties and OMI's insolvency proceedings. Accordingly, they strongly evidence the need for a Chapter 11 Trustee to oversee the Debtors' estate and assets.

**E.     The New York Guaranty Action**

27. On April 2, 2009, BNPP instituted an action in the Supreme Court of the State of New York, Index No. 601021-2009 against OBE, Olsen's Leasing LLC ("Olsen's Leasing"), Paul Olsen and David Olsen, collectively as Guarantors on the Guaranty (the "New York Guaranty Action").

28. On November 8, 2010, the Supreme Court of the State of New York ordered judgment against Paul and David Olsen, OBE and Olsen's Leasing in the amount of $50,703,904.17.

Page 9

Case 10-39799-svk    Doc 25    Filed 01/18/11    Page 9 of 16

## V. RELIEF REQUESTED AND SUPPORTING AUTHORITIES

29. By this Motion, BNPP respectfully requests the immediate appointment of a Chapter 11 Trustee (the "Trustee") "for cause," or, alternatively, "in the interest of creditors, any equity security holders, and other interests of the estate" pursuant to Section 1104(a) of the Bankruptcy Code.

30. Such relief is warranted because Paul Olsen has: (i) admitted his primary role in a felony by OMI involving knowingly dishonest and fraudulent misrepresentations to a Federal governmental agency; (ii) systematically engaged in a concerted scheme to dissipate the assets of OMI to defraud the Lenders and OMI's creditors; (ii) engaged in gross mismanagement or incompetence in the affairs of OMI to the detriment of the Lenders and OMI's other creditors, (iii) blatantly disregarded his fiduciary duties to OMI and its creditors; and (iv) defrauded BNPP by use of materially false written financial statements misrepresenting OMI's financial condition.

**A.     Section 1104(a)**

31. Section 1104 of the Bankruptcy Code provides in pertinent part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee -

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor. . .

11 U.S.C. § 1104(a).

32. Subsection (a)(2) of section 1104 contains a "flexible standard" that allows courts to look to the practical realities and necessities and appoint a trustee when it is in the best interests of the creditors of the estate. *In re Plaza De Retiro,* 417 B.R. at 640. Overall, the decision to appoint a trustee is fact intensive and must be made on a case by case basis. *See In re Plaza De Retiro*, 417 B.R. at 640 (internal citations omitted). *See also In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1988) (stating that, as recognized by the Court of Appeals for the Fourth Circuit, "courts must be given the discretion necessary to determine if the debtor-in-possession's conduct shown rises to a level sufficient to warrant the appointment of a trustee" (internal quotations omitted)). However, once the Court determines that "cause" exists under Section 1104(a)(1) of the Bankruptcy Code, the Court "shall" appoint a Trustee. *See Oklahoma Ref. Co. v. Blaik (In re Oklahoma Ref. Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988). Therefore, although the Court has general discretion to determine whether a Trustee should be appointed, appointment is <u>mandatory</u> when "cause" is found. *See In re Plaza De Retiro, Inc.*, 417 B.R. 632, 640 (Bankr. D.N.M. 2009); *Oklahoma Ref. Co. v. Blaik (In re Oklahoma Ref. Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("once cause is found the Court has no discretion and must appoint a trustee").

**B.     Substantial "Cause" Exists That Necessitates the Appointment of a Trustee**

33.     "Cause" expressly includes "fraud, dishonesty, incompetence, or gross mismanagement." 11 U.S.C. §1104(a)(1). Courts recognize that this list is not exhaustive or exclusive, and have found a wide variety of conduct by a debtor or its management to constitute "cause" to appoint a Trustee. *Id.*; *In re Bellevue Place Associates*, 171 B.R. at 623; *In re V. Savino Oil & Heating Co. Inc.*, 99 B.R. 518, 525 (E.D.N.Y. 1989).

34.     For example, the Court may find "cause" based on conduct by a debtor's management that occurred pre-petition or post-petition. *See, e.g., In re V. Savina Oil & Heating*,

99 B.R. at 526 (stating that the sole issue before the court was "whether the acts or omissions of current management, whether committed before or after filing the Chapter 11 petition, supply the 'cause', as defined, to trigger the appointment of a trustee"); *In re McCorhill Publ'g, Inc.*, 73 B.R. 1013 (Bankr. S.D.N.Y. 1987) (trustee appointed based solely on pre-petition conduct); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174 (Bankr. E.D.Pa. 1984) (same); *In re Main Line Motors, Inc.*, 9 B.R. 782 (Bankr. E.D. Pa. 1981) (same).

35. Courts have found that "cause" under section 1104 encompasses a wide variety of conduct by a debtor or its management applicable here, including, but not limited to:

(i) A history of questionable transactions with affiliates[5];

(ii) Failure to disclose material and relevant information, or, in fact, "affirmative efforts to misrepresent or conceal" material and relevant information[6];

(iii) Diversion of funds or misuses of corporate assets for the benefit of insiders[7];

(iv) Systematic siphoning of debtor's assets to subsidiaries and affiliates[8];

(v) Breach of fiduciary duties to the estate[9]; and

(vi) Failure to keep adequate records and to file required reports.[10]

---

[5] *See, e.g., In re Concord Coal Corp.*, 11 B.R. 552 (Bankr. S.D.W.Va. 1981); *In re Main Line Motors, Inc.*, 9 B.R. 782 (Bankr. E.D.Pa. 1981); *In re L.S. Good & Co.*, 8 B.R. 315 (Bankr. N.D.W.Va. 1980).

[6] *In re V. Savino Oil & Heating Co. Inc.*, 99 B.R. at 526.

[7] *In re PRS Ins. Group, Inc.*, 274 B.R. 381 (Bankr. D.Del. 2001) (*citing In re Bibo, Inc.*, 76 F.3d 256, 257-58 (9th Cir. 1996) (trustee mandated where management had siphoned funds from debtor); *In re Professional Accountants Referral Svcs., Inc.*, 142 B.R. 424, 428-29 (Bankr. D.Colo. 1992) (diversion of corporate assets for personal use constitutes dishonesty or gross mismanagement required trustee); *In re Colby Constr. Corp.*, 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985) (majority shareholder's "deliberate and unabashed conversion of corporate assets to acquire another company in his own name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonesty contemplated by that section")).

[8] *.In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989).

[9] *See In re Marvel Ent't Group, Inc.*, 140 F.3d at 474.

[10] *In re Oklahoma Refining Co.*, 838 F.2d at 1136 (*citing In re State Cap. Corp.*, 51 B.R. 400, 403 (Bankr. M.D.Fla. 1985); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. at 177, *In re Ford,* 36 B.R. 501, 504 (Bankr. W.D.Ky. 1983).

36.     Here, it is undisputed that Paul Olsen was responsible for OMI's felony conviction for knowing misrepresentation to the USDA.  It also cannot be reasonably disputed that, Paul Olsen engaged in a series of actions to systematically siphon assets from OMI to other affiliates when he knew that OMI was in serious financial default to the Lenders.  Through material misrepresentations on various Borrowing Base Certificates, Paul Olsen was able to induce continued advances from the Lenders and transfer grain purchased by OMI to Renew Energy at a time when he knew that Renew Energy, which Paul and David Olsen also controlled, had no ability to repay such advances.  Paul Olsen's admission in his email to Baylake Bank is clear evidence of his fraudulent conduct.  Despite such knowledge, Paul Olsen executed patently false financial information to the Lenders to induce the Lenders to continue providing credit to OMI.  In addition, as evidenced by his conduct with respect to the USDA charge and the Receivership, Paul Olsen's dishonesty and brazen willingness to violate his legal and fiduciary duties for his own benefit extends even to governmental entities and proceedings.  As such, he plainly cannot be reasonably entrusted to manage this bankruptcy estate for the benefit of its creditors.

### 1.     Olsen Has Mismanaged OMI and Breached His Duties to The Lenders and OMI's Other Creditors.

37.     Paul Olsen has also engaged in a series of actions which constitute gross mismanagement and incompetence.  The transactions with OMI's insider, Renew Energy, permitted Olsen to siphon off OMI's assets to the detriment of the Lenders and other OMI creditors.  "[A] history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee."  *In re Oklahoma Refining Co.,* 838 F.2d at 1136.

38.     Olsen did not enter into the transactions with Renew Energy to benefit OMI but to benefit Renew Energy to the detriment of OMI and OMI's creditors.  Siphoning assets to other

companies under common control raises serious questions about Paul Olsen's management and his ability to fulfill the debtor-in-possession's fiduciary obligations to creditors. *See, e.g., In re Sharon Steel Corp.*, 871 F.2d at 1228. A debtor-in-possession owes a "duty to protect and conserve property in its possession for the benefit of creditors." *Marvel*, 140 F.3d 474. Olsen demonstrably is either incapable of making, or unwilling to make, the selfless decisions required to be a debtor-in-possession, who is a fiduciary to all creditors and must ensure that all decisions are made for the benefit, not the detriment, of the estate. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 200 n.3 (1983).

### 2. Olsen Has Engaged in Fraudulent Conduct

39. Olsen's misrepresentations to the USDA and on the Borrowing Base Certificates were not mere miscalculations or oversights. To the contrary, Olsen executed a resolution for OMI's admission to knowingly and intentionally providing false information – through Paul Olsen himself – to the Federal government. His misrepresentations on various Borrowing Base Certificates were knowingly false, and knowingly concealed the true nature of OMI's financial condition to the Lenders. These actions evidence actual fraud and are clear justifications to appoint a Trustee. The Debtors' pre-petition conduct demonstrates that the Court <u>must</u> appoint a Trustee to preserve the interests of the estate and its creditors.

### C. The Court's Appointment Of A Trustee Is In The Interest Of Creditors And The Estate

40. Even if the appointment of a Trustee is not mandatory, for the same reasons, this Court should grant the appointment of a Trustee in its broad discretion. Specifically, "[i]t is clear, both from the language of the statute and established case law, that the court need not find any of the enumerated wrongs [of Section 1104(a)(1)] in order to find cause for appointing a

trustee." *In re Oklahoma Ref Co.*, 838 F.2d at 1136 (*citing In re William H. Vaughn & Co., Inc*., 40 B.R. 524 (Bankr. E.D. Pa. 1984)).

41. Section 1104(a)(2) grants the Court "particularly wide discretion" to appoint a Trustee if that appointment is "in the interest of creditors." *In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Bellevue Place Assocs.*, 171 B.R. at 623 (citing *Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 240 (4th Cir. 1987)); *In re Oklahoma Ref. Co.*, 838 F.2d at 1136. Under Section 1104(a)(2), courts generally consider four factors: (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the costs of appointment. *See, e.g., In re Plaza De Retiro*, 417 B.R. at 640.

42. Here, Olsen has engaged in a series of actions to dissipate assets and harm creditors. His prior misrepresentations and fraudulent conduct are evidence that he cannot be permitted to operate his businesses or manage the estate's affairs with the interests of creditors in mind. His conduct with respect to OMI's Receivership further reveals that he cannot be reasonably relied upon to honor his fiduciary and legal duties arising with respect to judicial proceedings, or to cooperate therewith in good faith. As previously discussed above, all of these considerations weigh in favor of the appointment of a Trustee here. The joinder in this Motion by a number of the largest creditors of this estate clearly indicate that the appointment of a Trustee would be in the best interests of creditors.

## VI. CONCLUSION

43. For the foregoing reasons, BNPP respectfully requests that the Court immediately appoint a Chapter 11 Trustee pursuant to Section 1104(a) because there is overwhelming "cause"

to appoint a Trustee, or, alternatively, because the appointment of a Trustee is in the interest of creditors, and other interests of the estate.

WHEREFORE, PREMISES CONSIDERED, BNPP respectfully requests that the Court enter its Order granting BNPP's Motion, immediately appointing a Trustee to manage and operate the assets and otherwise administer the Estate, and granting such other and further relief to which BNPP may show itself justly entitled.

Respectfully submitted this 19th day of January, 2010.

**GODFREY & KAHN, S.C.**


By: _____/s/ Carla O. Andres_____
    Timothy F. Nixon (WI Bar No. 1013753)
    Carla O. Andres (WI Bar No. 1020997)
    333 Main Street, Suite 600
    Green Bay, Wisconsin 54301
    Telephone: 920-432-9300
    Facsimile: 920-436-7988
    tnixon@gklaw.com
    candres@gklaw.com


and

MUNSCH HARDT KOPF & HARR, P.C.
Joseph J. Wielebinski (TX Bar No. 21432400)
Deborah M. Perry (TX Bar No. 24002755)
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
jwielebinski@munsch.com
dperry@munsch.com


*ATTORNEYS FOR PLAINTIFF, BNP PARIBAS, AS AGENT*

5885604_1